UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SEAN TOLMASOFF, on behalf of
himself and all other similarly situated,

      Plaintiff,           CASE NO. 16-11747
                             HONORABLE GEORGE CARAM STEEH

    v.

GENERAL MOTORS, LLC,

      Defendant.

_____/

**OPINION AND ORDER DENYING IN PART AND GRANTING IN PART
PLAINTIFF'S MOTION FOR PROVISIONAL CLASS CERTIFICATION AND
APPOINTMENT OF CLASS COUNSEL (DOC. 6) AND DENYING PLAINTIFF'S
<u>MOTION TO INVALIDATE RELEASES AND ENJOIN DEFENDANT (DOC. 7)</u>**

This is a proposed class action brought by Plaintiff Sean Tolmasoff ("Plaintiff") on

behalf of a proposed class of current and former owners of the 2016 Chevrolet Traverse,

the 2016 Buick Enclave, and the 2016 GMC Acadia. Plaintiff alleges that defendant

General Motors ("GM") overstated the fuel economy ratings of these three vehicles (the

"Class Vehicles"), and he is suing under the Michigan Consumer Protection Act,[1] the

Florida Deceptive and Unfair Trade Practices Act,[2] and the common-law causes of action

of fraud, negligent misrepresentation, and unjust enrichment. Now before the Court are

two motions. In the first motion, Plaintiff moves for "provisional" class certification under

Federal Rule of Civil Procedure 23(b)(2) and, in the alternative, for the appointment of

_____

[1] Mich. Comp. Laws § 445.901 *et seq.*

[2] Fla. Stat. § 501.201 *et seq.*

-1-

interim class counsel under Rule 23(g)(3).  (Doc. 6).  In the second motion, Plaintiff moves the Court to invalidate releases solicited by GM and executed by thousands of putative class members and to enjoin GM from further communicating with putative class members about the subject matter of the instant lawsuit.  (Doc. 7).

For the reasons explained below, the Court will deny Plaintiff's motion for provisional class certification and appointment of interim class counsel in part and grant it in part.  In short, class certification under Rule 23(b)(2) would be improper because Plaintiff's complaint does not contain a plea for final injunctive or declaratory relief except for a *pro forma* request in the "prayer for relief" section of the complaint.  Therefore the Court will not certify Plaintiff's proposed class at this time.  The Court will, however, designate Plaintiff's current counsel of record as interim class counsel, as requested.  For the reasons explained below, the Court will deny in full Plaintiff's motion to invalidate the releases and enjoin GM's communications.  The invalidation of all releases signed thus far by the potential class members, without even seeking their input, would be an extreme form of relief unauthorized by Rule 23(d).  And enjoining GM from communicating with potential class members would be inappropriate under Rule 23(d) because Plaintiff has failed to demonstrate that GM's communications with the potential class members have been coercive, misleading, or otherwise abusive.

## I.    Background

In his complaint, Plaintiff alleges that until May 2016, GM was overstating the fuel economy of the three Class Vehicles.  (Compl., Doc. 1, ¶ 1).  Although GM has not yet filed an answer, GM acknowledged in its briefs and at the June 22, 2016, hearing on the two instant motions that the fuel economy ratings "had been overstated by one or two miles per

gallon." (Def.'s Br. Opp'n Pl.'s Mot. Invalidate Releases & Enjoin Def., Doc. 13, at 6[3]). Plaintiff claims that GM "actively concealed the fact that the fuel-economy ratings . . . were false," and Plaintiff also claims that "GM knew or should have known that the Class Vehicles were being advertised and sold with false and misleading fuel-economy ratings." (Compl. ¶¶ 5-6). GM, however, contends that it misstated the Class Vehicles' fuel-economy ratings"due to an inadvertent error." (Def.'s Br. Opp'n Pl.'s Mot. Invalidate Releases & Enjoin Def. at 6). As stated above, Plaintiff's complaint pleads statutory consumer-fraud claims, as well as fraud, negligent misrepresentation, and unjust enrichment.

Plaintiff seeks to represent a class of purchasers and lessees of the Class Vehicles. Plaintiff proposes two different classes: a Nationwide Class and a Florida[4] Class. (Compl. ¶¶ 25-26). The Nationwide Class would include "[a]ll persons or entities in the United States who are current or former owners and/or lessees of a Class Vehicle," excluding those persons or entities that purchased the Class Vehicles for resale, the judge assigned to the case, and certain persons and entities associated with GM. (*Id.* ¶¶ 25, 27). The Florida Class (pleaded in the alternative) would be similar to the Nationwide Class but would be limited to "persons or entities in Florida." (*Id.* ¶ 26). It appears that the Nationwide Class would include at least 80,000 people and perhaps even over 130,000 people. (*See id.* ¶¶ 22, 30 (indicating that "at least 82,137 Class Vehicles were sold"); Pl.'s Mot. Provisional Class Cert., Doc. 6, at 11 (stating that GM sold or leased "between

---

[3] All citations refer to the ECF page numbers.

[4] Plaintiff is a Florida resident. (Compl. ¶ 12).

135,000 to 170,000 of the Class Vehicles"); *see also* Def.'s Br. Opp'n Pl.'s Mot. Invalidate Releases & Enjoin Def. at 8 (indicating that there were "107,000 involved retail customers")).

The motion to invalidate releases and enjoin GM arises from a "reimbursement" program initiated by GM. (Pl.'s Mot. Invalidate Releases & Enjoin Def., Doc. 7, at 6; Def.'s Br. Opp'n Pl.'s Mot. Invalidate Releases & Enjoin Def. at 6). GM mailed letters to the 107,000 affected customers. (Def.'s Br. Opp'n Pl.'s Mot. Invalidate Releases & Enjoin Def. at 6, 8). In the letter, GM "apologize[s]" for the "unintentional error" and offers the recipient a "reimbursement" purportedly based on the estimated increased cost of fueling the vehicle over five years due to GM's error. (Letter to Owner of 2016 Chevrolet Traverse, Doc. 7-2).[5] The letter offers the recipient two options for "reimbursement." The first option is a prepaid debit card containing either $750 or $1,500 depending on whether the vehicle owned by the letter's recipient was downgraded by one or two miles per gallon, respectively. (*Id.*; Decl. David Garrett, Doc. 13-3, ¶ 3). The second option is an extended warranty. (Letter to Owner of 2016 Chevrolet Traverse). The letter further says, "Whichever option you choose, to obtain reimbursement, please log in [to a GM website]. . . . Once you log in, you will be asked to select one of these two options and agree to certain terms and conditions, *including a waiver of claims related to this error*." (*Id.* (emphasis added)).

---

[5] GM's Director of Global Vehicle Emissions Compliance executed a declaration explaining how the amount was calculated. (Decl. David Garrett, Doc. 13-3; *see also* Def.'s Br. Opp'n Pl.'s Mot. Invalidate Releases & Enjoin Def. at 10-11 & n.5). GM's calculation is based on the assumptions that the cost of fuel will be $3.00 per gallon, and that the average driver will drive 15,000 miles per year. (Decl. David Garrett ¶ 3).

At the motion hearing, GM demonstrated the reimbursement website referenced in the letter.  GM also provided screen shots of the website as exhibits to a declaration executed by GM's Director of Customer Lifecycle Management.  (*See* Decl. Julie Heisel, Doc. 13-2).  The first page of the website tells the visitor to "[p]lease follow the steps outlined on the following pages to claim reimbursement for the window label estimated mileage error," and prompts the visitor to enter his or her vehicle identification number ("VIN") and a GM-provided personal identification number ("PIN").  (*Id.* ¶ 5 & Ex. C-1).  The page contains two different links to a "Frequently Asked Questions" page.  (*See id.* Ex. C-1).  The first such link is quite conspicous and appears before the fields for entry of the VIN and PIN.  (*See id.*).  The second such link is at the bottom of the page, and it also appears at the bottom of all of the other pages of GM's reimbursement website.  If the visitor clicks on one of the Frequently Asked Questions links, he or she or she is taken to a page that contains, among other things, the following question and answer: "Is GM requiring customers to sign a legal release?  Yes.  We believe we are providing full reimbursement, so we feel a release is appropriate."  (*Id.* Ex. C-2).  The Frequently Asked Questions page also explains that the reimbursement was calculated based on the estimated increased cost of fueling the affected vehicle over five years, assuming that the cost of fuel would be $3 per gallon and that the customer would drive 15,000 miles per year.  (*Id.*).

If the visitor enters his or her VIN and PIN into the first page and clicks the "Next" button, the visitor is taken to a page containing information about two lawsuits, including the instant lawsuit.  (Decl. Julie Heisel ¶ 6 & Ex. C-3).  That page explains

> You should know that *putative class action lawsuits have been served on GM* concerning the error on the window label which affected the EPA-estimated mileage.  If you would like to review copies of these lawsuits in full, they are

available to you simply by clicking on [links provided on the page].  *Should you wish to contact the counsel that filed these lawsuits, their contact information is provided at the end of the attached complaints.*

(*Id.* Ex. C-3 (emphases added)).  The page contains links to the three[6] complaints.[7]  (*See id.* Exs. C-3, C-4, C-5).  Plaintiff states that "according to many putative class members who tried to access [the link to the instant case's complaint], the link provided did not work," but provides no evidence that the link actually did not work.  (Pl.'s Mot. Invalidate Releases & Enjoin Def., Doc. 7, at 10).  At the motion hearing, the link to the Plaintiff's complaint functioned properly.  Below the links to the three complaints, the page says, "If you wish to proceed to claim your compensation, click NEXT."  (Decl. Julie Heisel Ex. C-3).

If the visitor clicks the "Next" button, he or she is taken to a third page, which advises the visitor to "confirm [his or her] compensation by August 1, 2016."  (Decl. Julie Heisel Ex. C-6 (capitalization removed)).  The page states that "you have your choice of two offers" and allows the visitor to select his or her preferred reimbursement option by clicking the appropriate checkbox.  (*Id.*).  The page also contains, among other things, a

---

[6] When the parties filed their papers for the instant motions, there were only two lawsuits against GM involving the fuel-economy issue.  At the hearing, GM's counsel explained that there are now three such lawsuits.

[7] Plaintiff believes it to be significant that the copies of the complaints provided by GM are not "searchable."  (*See* Pl.'s Reply Br. Supp. Mot. Invalidate Releases & Enjoin Def., Doc. 15, at 7 n.2).  That is, the complaints were apparently scanned as images rather than generated from a text document and have not been processed with OCR software, and therefore a reader cannot use the search function of his or her PDF reader to locate key words in the complaints.  Given that the complaint in the instant case is a mere twenty-one pages of fairly sparse text, it is immaterial that the complaint is unsearchable.

link to a PDF file that provides a side-by-side comparison of the old, incorrect fuel-economy window label and the new, correct window label.  (*Id.* Exs. C-6, C-7).

Even after clicking the appropriate compensation checkbox, the visitor cannot proceed to the next page without first reading a "Release of Specified Claims." (Decl. Julie Heisel Ex. C-11).  Specifically, under the part of the third page where the visitor selects his or her reimbursement option, there is a "Terms and Conditions" section, which states

> So GM can send your compensation, *you will need to agree to a release of claims* related to the window label error.  Please carefully review the entire release displayed below.  Take your time to make sure you fully understand the terms.  If you wish, *consult with a lawyer of your choice*.

(*Id.* (emphases added)).  Beneath that text is a scrollable text box containing the "Release of Specified Claims." (*Id.*).  The release is approximately 1100 words (or two pages of single-spaced text).[8]  Furthermore, the entire release document concerns the release of claims—that is, the release is not buried in a document with unrelated content.  (*Id.* Ex. C-12).  The first paragraph of the release states,

> This is a release ("Release") of *any and all claims, demands, actions, or causes of action*, either known or unknown, against [GM and various "persons or entities" affiliated with GM] arising out of or in any way related to, an error concerning EPA estimated fuel economy on the window label . . . which caused the EPA estimated fuel mileage to be over stated . . . and the expected fuel costs . . . to be understated.

---

[8] Plaintiff complains that the text box is too small to allow a visitor to the website to easily read the release.  (Pl.'s Mot. Invalidate Releases & Enjoin Def. at 9).  Plaintiff's complaint is without merit.  The text box is an adequate size.  From the screen shot provided by Plaintiff, it appears that the text box is approximately ten lines high and displays approximately ten words on each line.  (*See id.*).  But the size of the text box appears to vary with the size of the browser window—the screen shot provided by GM shows a somewhat larger text box.  (*See* Decl. Julie Heisel Ex. C-11).  The text is more than readable in both parties' screen shots.  Moreover, as GM has pointed out, a visitor to the website can easily copy and paste the text from the text box into another program if he or she would prefer to print the release or read it using the other program.

-7-

(*Id*.).  Paragraph 2(a) states that "[b]y agreeing to this Release, Releasor forever *waives and releases all claims, damages, demands, costs, actions, or causes of action*, either known or unknown, that Releasor may have or may hereafter have" involving the fuel-economy estimates (emphasis added).  Paragraph 2(b) states that "[t]his Release applies to *all claims, demands, actions, or causes of action*, either known or unknown, against the Released Parties regardless of legal or equitable theory," involving the fuel-economy estimates (emphasis added).  Paragraph 2(e) states that "Releasor *agrees not to file, commence, or participate in any legal proceeding* against the Released Parties," involving the fuel-economy estimates (emphasis added).  As Plaintiff notes, the release does not specifically use the words "class action" or explicitly mention the instant case.  (*See id*.; *see also* Pl.'s Mot. Invalidate Releases & Enjoin Def. at 9).  In order to accept the offer and agree to the "Release of Specified Claims," the visitor must scroll through the entire release, at which point a text field will become active.  (Decl. Julie Heisel Ex. C-11).  At that point, the visitor must enter his or her PIN into the text field and click a button that says "I agree to and accept the release."  (*Id*.).  Several additional pages follow, but none of those pages involve anything material to the two motions before the Court.  At the motion hearing, GM demonstrated that the website contained "go back and edit" buttons on each page.  These buttons allow the visitor to change his or her reimbursement selection or to cancel his or her acceptance of the release up until the time the visitor clicks "Confirm" on the final page.  (*See id*. Ex. C-14).

Plaintiff contends that the letter and web pages described above are "misleading, confusing and coercive because [they] fail[] to include necessary information to enable recipients to determine whether to accept the offer."  (Pl.'s Mot. Invalidate Releases &

Enjoin Def. at 6).  Plaintiff also states that

> as of the date of this filing [i.e., June 7, 2016], Plaintiff's counsel has been contacted by over one hundred putative class members who are confused about the offer, seeking a description of the lawsuit, what damages the lawsuit seeks to recover, how GM arrived at their debit card offer, whether the offer is the result of the settlement of the class action, whether the release precludes their participation in the class action, and whether the class action could recover additional damages above what GM is currently offering.

(*Id.* at 10-11).   Plaintiff provides several declarations from putative class members. Potential class members Paul Cappoferri and Nicholas Mundo executed nearly identical declarations stating, among other things, that:

- "Based on the use of the word 'reimbursement' on GM's website, I understood that to mean that GM was offering the same or substantially similar recovery to what the class action lawsuit would seek to recover." (Decl. Paul Cappoferri, Doc. 15-1, ¶ 4; Decl. Nicholas Mundo, Doc. 15-1, ¶ 4).

- "I saw that Plaintiff's complaint sought $5,000,000.00 in damages and assumed that amount would be divided equally among approximately 100,000 class vehicles."  (Decl. Paul Cappoferri ¶ 5; Decl. Nicholas Mundo ¶ 5).

- "After reviewing the release of claims on GM's website, I was unsure if the release meant I would be unable to participate in any class action settlement or jury verdict in the future."    (Decl. Paul Cappoferri ¶ 6; Decl. Nicholas Mundo ¶ 6).

Putative class member Nancy Burnett executed a declaration in which she stated that she is seventy-two years old and went to a GMC dealership to receive help accessing the

website referenced in the letter.  (Decl. Nancy Burnett, Doc. 15-1, ¶¶ 2, 6).  Although the employee at the dealership printed off copies of the complaints linked on the website, the employee did not print the release or ask Ms. Burnett to review it.  (*Id.* ¶¶ 8-10).  The employee accepted the reimbursement on behalf of Ms. Burnett and printed a confirmation page for her.  (*Id.* ¶ 9; *see also* Decl. Tom Burnett, Doc. 15-1).

GM argues that there is nothing misleading or coercive about the "reimbursement" program.    At the hearing, GM stated that about 65,000 people have accepted the reimbursement offer.  (*See also* Def.'s Br. Opp'n Pl.'s Mot. Invalidate Releases & Enjoin Def. at 11; Decl. Julie Heisel ¶ 9).  The vast majority of those individuals have chosen the debit card rather than the extended warranty.  (Decl. Julie Heisel ¶ 9).[9]

---

[9] In the parties' briefs concerning the two motions, the parties disputed the issue of whether GM instituted the reimbursement program in response to Plaintiff's filing of the instant lawsuit.  (*See* Pl.'s Mot. Invalidate Releases & Enjoin Def. at 7;  Def.'s Br. Opp'n Pl.'s Mot. Invalidate Releases & Enjoin Def. at 12; Decl. Joseph Lines, Doc. 13-4, ¶ 2).  Based on the evidence presented by the parties, it appears that GM initiated the reimbursement program in *anticipation* of one or more lawsuits, but it does not appear that the reimbursement program was a direct response to the instant lawsuit. However, as Plaintiff's counsel pointed out at the motion hearing, the issue is ultimately immaterial.  Rather, the key issue is whether GM's reimbursement program has been abusive in some way, as explained below.

The parties have also referenced other class-action lawsuits involving automotive companies.  (*See* Pl.'s Mot. Provisional Class Certification, Doc. 6, at 14; Def.'s Br. Opp'n Pl.'s Mot. Invalidate Releases & Enjoin Def. at 7-8).  Plaintiff contends that the releases sought by GM in the instant case are unprecedented and that automotive companies usually offer compensation purely as a "good will gesture."  For its part, GM contends that class-action lawsuits often impede the prompt payment of compensation to affected customers.  Neither party's contention has any significant bearing on the matters presently before the Court.

## II.     Motion for Provisional Class Certification and Appointment of Class Counsel (Doc. 6)

Plaintiff has moved the Court to "provisionally" certify his proposed class and, in the alternative, for the Court to appoint interim class counsel.  The Court will deny the motion in part and grant it in part.  Plaintiff has not shown that the requirements of Federal Rule of Civil Procedure 23(b)(2) are satisfied, as explained below.  Thus, the Court will not certify the class at this time.  The Court does, however, find that it would be appropriate to designate interim class counsel, and the Court will therefore designate Plaintiff's current counsel of record as interim class counsel.

### A.     Class Certification

A district court may certify a class only after it has conducted a "rigorous analysis" indicating that the requirements of Federal Rule of Civil Procedure 23 are satisfied.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)) (internal quotation marks omitted).  A court should decide whether to certify a class "[a]t an early practicable time" after the institution of the action.  Fed. R. Civ. P. 23(c)(1)(A).  Moreover, an order granting or denying class certification "may be altered or amended" at a later time.  Fed. R. Civ. P. 23(c)(1)(C).  But these two provisions do not grant district courts the authority to "provisionally" certify a class that does not fully satisfy the requirements of Rule 23(a) and (b).  Rather, "[a] court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met."  Fed. R. Civ. P. 23 committee notes; *see also Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675-76 (7th Cir. 2001) ("[A]n order certifying a class usually is the district judge's last word on the subject; there is no later test of the

decision's factual premises (and, if the case is settled, there could not be such an examination even if the district judge viewed the certification as provisional)."); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 179-80 (D.D.C. 2015) ("In granting . . . provisional certification, the Court must still satisfy itself that the requirements of Rule 23 have been met.").

A party moving for class certification must (1) "*prove*" that the prerequisites of Rule 23(a) are satisfied and (2) *"satisfy through evidentiary proof* at least one of the provisions of Rule 23(b)." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (emphases added). The prerequisites of Rule 23(a) are "numerosity, commonality, typicality, and adequate representation." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013). To establish them, the moving party must show that

> (1) the class is so numerous that joinder of all members [of the class] is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). There are three provisions under Rule 23(b) that could support the certification of a class. The one relied upon by Plaintiff in the instant motion is Rule 23(b)(2). A plaintiff relying on Rule 23(b)(2) must establish that "[1] the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that [2] final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Although Plaintiff's proposed class may well satisfy the prerequisites of Rule 23(a),[10] Plaintiff has completely failed to show that class certification would be appropriate under Rule 23(b)(2). In particular, Plaintiff has failed to establish the second prong of Rule 23(b)(2) because Plaintiff's lawsuit does not involve a claim for final injunctive or corresponding declaratory relief.

By the plain terms of Rule 23(b)(2), a class may be certified under this provision only if "final injunctive or [corresponding[11]] declaratory relief [is] requested against the party opposing the class." 7AA Charles A. Wright *et al.*, Federal Practice and Procedure § 1775 (3d ed.); *see also R.I.L-R*, 80 F. Supp. 3d at 182; *Yue v. Conseco Life Ins. Co.*, 282 F.R.D. 469, 479 (C.D. Cal. 2012) (approving the certification of a class under Rule 23(b)(2) where "[i]n her Complaint, Plaintiff [sought] . . . injunctive and declaratory relief"). Thus, a plaintiff seeking to certify a class under Rule 23(b)(2) must first plead a claim for injunctive relief in his or her complaint. The Supreme Court's discussion in *Wal-Mart*, 564 U.S. 338, confirms this reading of Rule 23(b)(2). In *Wal-Mart*, the Court held that the district court had improperly certified the plaintiff class's claims for back pay under Rule 23(b)(2). *Id.* at 360. The Court explained that "claims for monetary relief may [not] be certified under [Rule

---

[10] GM does not serious dispute at this time that Plaintiff's proposed class satisfies the prerequisites of Rule 23(a), and it appears to the Court that Plaintiff's proposed class does qualify under Rule 23(a). However, given that Plaintiff's motion for class certification clearly fails under Rule 23(b)(2), the Court will defer making findings concerning Rule 23(a) until such time as Plaintiff files a second motion for class certification.

[11] "Declaratory relief 'corresponds' to injunctive relief when as a practical matter it affords injunctive relief or serves as a basis for later injunctive relief." Fed. R. Civ. P. 23 committee notes. Thus, a declaration stating that the plaintiff class members are entitled to money damages or that they have been damaged by the defendant's past conduct does not typically "correspond" to injunctive relief.

-13-

23(b)(2)] provision . . . at least where . . . the monetary relief is not incidental to the injunctive or declaratory relief." *Id.* The Court rejected the plaintiffs' argument that a claim for back pay is "equitable in nature" and could therefore be certified under Rule 23(b)(2), with a textual argument. *Id.* at 365. As the Court explained, "[t]he Rule does not speak of 'equitable' remedies generally but of injunctions and declaratory judgments." *Id.* at 365. If Rule 23(b)(2) does not allow the certification of a *claim* for money damages, then Rule 23(b)(2) certainly does not allow the certification of a class where the complaint contains *nothing but* claims for money damages.

In the instant case, Plaintiff seeks damages, on behalf of himself and the putative class members, for alleged misrepresentations by GM. Plaintiff does not seek injunctive relief. The prayer for relief at the end of Plaintiff's complaint includes a demand for "an order enjoining the wrongful conduct alleged herein" and "[f]or such equitable relief as the Court deems just." But this *pro forma* request for equitable relief does not constitute a request for final injunctive relief sufficient to satisfy the second prong of Rule 23(b)(2). This is because (1) nothing else in the complaint signals that Plaintiff is seeking equitable relief, and (2) there is no indication or allegation that GM's alleged misrepresentations are continuing. To the extent that Plaintiff seeks a final injunction (or perhaps final declaratory relief), such equitable relief would pertain to past conduct and would essentially be a form of money damages. *See Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 531 (D.C. Cir. 2006) (refusing to certify a class under Rule 23(b)(2) where the plaintiff sought an injunction and declaration that was nothing more than a "judicial decree directing [the defendant] to pay the class members the damages each is due").

Plaintiff wants the Court to certify his class under Rule 23(b)(2) because Plaintiff

seeks an *immediate* order enjoining GM from communicating with potential class members. Thus, Plaintiff is seeking a form of preliminary injunctive relief (albeit under Rule 23 rather than under Rule 65). But by its terms, Rule 23(b)(2) does not allow for the certification of a class on the ground that *preliminary* injunctive relief would be appropriate; rather, *final* injunctive relief must be appropriate for Rule 23(b)(2) to be satisfied. Moreover, the Court need not certify Plaintiff's class to grant him the preliminary injunctive relief requested; the Court is authorized to order such relief pursuant to Rule 23(d) even prior to class certification. The problem for Plaintiff is that, as explained in more detail below, his Rule 23(d) motion to invalidate releases and enjoin communications is also without merit.

Plaintiff's counsel argued at the motion hearing that GM's communications with the potential class members have given rise to a new claim for which injunctive relief would be appropriate. But Plaintiff has not amended his complaint to state this claim. Moreover, it is unclear what kind of freestanding claim Plaintiff would have against GM for its alleged abusive communications; Plaintiff has not cited any law or explained what the basis of this claim would be.[12] Furthermore, the Court fails to see what kind of *final* injunctive relief would be appropriate for such a claim.

Plaintiff cites some cases for the proposition that Rule 23(b)(2) along with Rule 23(d) allow for "provisional class certification" for the purpose of entering a preliminary injunction. *See Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 441-42 (7th Cir. 2015); *Meyer v. Portfolio Recovery Associates, LLC*, 707 F.3d 1036, 1041-43 (9th Cir. 2012); *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994); *Carrillo v.*

---

[12] Rather, Plaintiff focuses on the *procedural issue* of whether GM's behavior is sufficiently abusive to justify an injunction under Rule 23(d), as explained below.

-15-

*Schneider Logistics, Inc.*, No. CV-11-8557 CAS DTBX, 2012 WL 556309, at *9 (C.D. Cal. Jan. 31, 2012) (unpublished).  But the cases cited by Plaintiff are distinguishable, unclear, and/or unpersuasive.

In *Chicago Teachers Union*, it appears that the complaint included an appropriate plea for final injunctive relief.  *See Chicago Teachers Union, Local 1 v. Bd. of Educ. of City of Chicago*, 301 F.R.D. 300, 311 (N.D. Ill. 2014) (the district court opinion reversed by the Seventh Circuit opinion cited by Plaintiff).  Thus, the Seventh Circuit did not hold, explicitly or implicitly, that it was appropriate to certify a class under Rule 23(b)(2) absent a plea for final injunctive or corresponding declaratory relief.

In *Meyer*, the court certified a "provisional" class under Rule 23(b)(2) and issued a preliminary injunction enjoining the defendant from contacting putative class members. 707 F.3d at 1041-43.  But the plaintiff in that case was also seeking (on behalf of himself and the putative class members) *final* relief under the Telephone Consumer Protection Act.  *Id.* Thus, although the court certified the class for the purpose of issuing a preliminary injunction enjoining the calls, final injunctive relief regarding the calls would have been *appropriate*, thus satisfying the second prong of Rule 23(b)(2).  *Id.* at 1043.

In *Reno*, the district court had ordered preliminary injunctive relief *before* certifying the class, and thus the case offers no support for the proposition that a class may be certified provisionally for the purpose of ordering preliminary injunctive relief.  35 F.3d at 1103.  Moreover, in *Reno* the issue of class certification was not raised on appeal, and it

-16-

also appears that in that case final injunctive relief would have been appropriate.  *Id.* at 1103-04.[13]

And *Carrillo* is an unpublished district court case from another circuit.  The court in that case held that "[p]ursuant to Rule 23 and the Court's general equitable powers, the Court has authority to provisionally certify a class for purposes of entering preliminary injunctive relief."  2012 WL 556309, at *8 (citing *Thomas v. Johnston*, 557 F. Supp. 879, 916 n. 29 (W.D. Tex. 1983)).  But the case contains no substantive legal analysis on this point and is therefore unpersuasive.  Furthermore, it is unclear from the opinion whether or not the plaintiff's complaint contained a plea for final injunctive relief.  Thus, it is unclear whether the facts in *Carrillo* are at all analogous to the facts in the instant case.  All other cases cited by Plaintiff are similarly unpersuasive.

In sum, the Court cannot certify Plaintiff's class under Rule 23(b)(2).  Plaintiff has failed to establish that final injunctive or corresponding declaratory relief would be appropriate.

### B.    Designation of Interim Class Counsel

Plaintiff requests that the Court appoint interim class counsel.  Rule 23(g)(3) provides that "[t]he court may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action."  "[D]esignation of interim counsel clarifies responsibility for protecting the interests of the class during precertification

---

[13] Moreover, the plaintiffs in *Meyer* and *Reno* established the prerequisites for the issuance of a preliminary injunction under Rule 65.  *See infra* note 15.  Plaintiff has made no attempt to do so in the instant case.  Of course, Plaintiff is correct that he need not establish these requirements in order to obtain an injunction under Rule 23(d), as explained below.  But Rule 23(d) relief does not depend on provisional class certification, as explained above.

activities, such as making and responding to motions, conducting any necessary discovery, moving for class certification, and negotiating settlement." Manual for Complex Litigation (Fourth) § 21.11. Designation of interim counsel is particularly appropriate when a number of lawyers have filed related "copycat" actions. *See id.* Here, two related lawsuits have already been filed and others may follow. Moreover, the Court believes that it would be beneficial to formally identify the counsel responsible, at this pre-certification stage, for protecting the interests of the putative class members. Therefore, the Court will designate interim counsel.

The considerations set out in Rule 23(g)(1), which govern the appointment of post-certification class counsel, are equally applicable to a decision on whom to designate as interim class counsel. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, 240 F.R.D. 56, 57 (E.D.N.Y. 2006). Thus, in deciding whether to designate Plaintiff's counsel as interim class counsel, the Court will consider

> (I) the work counsel has done in identifying or investigating potential claims in the action;
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
> (iii) counsel's knowledge of the applicable law; and
> (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A). Furthermore, the Court will consider whether Plaintiff's counsel will "fairly and adequately represent the interests of the [putative] class." Fed. R. Civ. P. 23(g)(4).

The counsel representing Plaintiff have expended considerable time and effort filing the instant action and briefing the two motions now before the Court. Although after close analysis the two motions are ultimately without merit, the motions were well-researched and

-18-

argued. Thus, the Court finds that Plaintiff's current counsel have adequate knowledge of the applicable law. Plaintiff's counsel come from two different firms, the Miller Law Firm, P.C., and McCuneWright LLP. Both firms have extensive experience in prosecuting complex class-action lawsuits, as the firms' *curricula vitae* outline, and both firms have sufficient resources to prosecute the instant action. (*See* Docs. 6-11, 6-12). Furthermore, given Plaintiff's counsel's diligent conduct thus far, and given that neither party has apprised the Court of any conflict of interest or other impediment to counsel's execution of their duties to the potential class members, the Court concludes that counsel will fairly and adequately represent the interests of the putative class. Therefore, the Court will designate Plaintiff's current counsel of record as interim class counsel.[14]

### III. Motion to Invalidate Releases and Enjoin Defendant from Communicating with Putative Class Members (Doc. 7)

Plaintiff moves to enjoin GM from communicating with potential class members and to invalidate releases that have already been executed by the potential class members. The Court will deny this motion in full. GM's communications were not abusive: They were neither misleading nor coercive. Moreover, unilaterally invalidating the releases that have been signed so far would potentially be unfair to those who have executed the releases. These individuals may well be satisfied with GM's offer of compensation.

### A. Legal Standard for Orders Under Rule 23(d)

It is well established that Federal Rule of Civil Procedure 23(d) authorizes a court to enjoin a named party from communicating with unnamed potential class members. *See*

---

[14] The findings in this paragraph are completely provisional and will be revisited if and when Plaintiff's counsel presents the Court with a subsequent motion for class certification.

-19-

Fed. R. Civ. P. 23(d)(1) ("In conducting an action under this rule, the court may issue orders that: . . . (C) impose conditions on the representative parties or on intervenors . . . ."); *see also Urtubia v. B.A. Victory Corp.*, 857 F. Supp. 2d 476, 484 (S.D.N.Y. 2012) ("Rule 23 . . . provides that, in the context of a class action, a district court may impose conditions on the representative parties, which includes limiting communications between representative parties and potential class members."); *Wright v. Adventures Rolling Cross Country, Inc.*, No. C-12-0982 EMC, 2012 WL 2239797, at *4 (N.D. Cal. June 15, 2012) (unpublished); *In re Se. Milk Antitrust Litig.*, No. MDL 1899, 2009 WL 3747130, at *2 (E.D. Tenn. Nov. 3, 2009) (unpublished) ("[T]he court's authority to limit communication is quite clearly established by the weight of applicable authority, subject only to restrictions mandated by the First Amendment."); *Bublitz v. E.I. duPont de Nemours & Co.*, 196 F.R.D. 545, 547 (S.D. Iowa 2000)*; Hampton Hardware, Inc. v. Cotter & Co.*, 156 F.R.D. 630, 633 (N.D. Tex. 1994); Manual for Complex Litigation (Fourth) § 21 ("Once class allegations are made, decisions such as whether to settle and on what terms are no longer wholly within the litigants' control. . . . *The court must protect the interests of absent class members, and Rule 23(d) gives the judge broad administrative powers to do so, reflecting the equity origins of class actions.*" (emphasis added)); 7B Charles A. Wright *et al.*, Federal Practice and Procedure § 1794 (3d ed.) ("[A] gag order in a particular case may be a permissible exercise of the court's power to manage the class suit under Rule 23(d)."). This authority under Rule 23(d) to enjoin or control communications exists even prior to class certification. *See Urtubia*, 857 F. Supp. 2d at 484 ("A court possesses such supervisory authority even before a class is certified."); *accord Friedman v. Intervet Inc.*, 730 F. Supp. 2d 758, 768 n.2 (N.D. Ohio 2010)*; Sorrentino v. ASN Roosevelt Ctr.* LLC, 584 F. Supp. 2d 529, 532

(E.D.N.Y. 2008).

Because the source of the Court's authority to enjoin abusive communications is Rule 23(d) rather than Rule 65 (governing preliminary injunctions and restraining orders), a party does not have to establish the four preliminary-injunction factors[15] to obtain such an injunction. *See Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193, 1201 (11th Cir. 1985) (An order enjoining abusive communications is a "directive[] to counsel in their capacity as officers of the court, pursuant to the court's inherent power to manage its cases. . . . The more relaxed prerequisites of Rule 23[] therefore appl[y] . . . ."). Nonetheless, a court's discretion to enter such an order "is not unlimited, and indeed is bounded by the relevant provisions of the Federal Rules," as well as by the First Amendment. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981).[16] Generally speaking, "[a] defendant has a right to communicate settlement offers directly with putative class members." *Jones v. Jeld-Wen, Inc.*, 250 F.R.D. 554, 562 (S.D. Fla. 2008); *see also* Manual for Complex Litigation (Fourth) § 21.12 ("Defendants and their counsel generally may

---

[15] The four preliminary-injunction factors are:
(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.
*Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005) (quoting *PACCAR Inc. v. TeleScan Techs., L.L.C.*, 319 F.3d 243, 249 (6th Cir. 2003)) (internal quotation marks omitted).

[16] *Gulf Oil* involved an order that enjoined the named *plaintiffs* from communicating with potential plaintiff class members. Nonetheless, most courts view the standard set forth in *Gulf Oil* as equally applicable to orders enjoining *defendants* from communicating. *See Cox Nuclear Med. v. Gold Cup Coffee Servs., Inc.*, 214 F.R.D. 696, 697 (S.D. Ala. 2003) (collecting cases).

communicate with potential class members in the ordinary course of business, including discussing settlement before certification . . . .").  Thus, "a blanket prohibition against such communications, without requiring any proof and findings of specific need, [is] unauthorized by and . . . inconsistent with Rule 23."  *Cada v. Costa Line, Inc.*, 93 F.R.D 95, 98 (N.D. Ill. 1981); *see also Williams v. U.S. Dist. Court*, 658 F.2d 430, 435 (6th Cir. 1981).

Rather, to satisfy the requirements of Rule 23(d), "an order limiting communications between parties should be based on a *clear record* and *specific findings* that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties" that would occur if such an order is not granted.  *Gulf Oil*, 452 U.S. at 101 (emphases added).  The moving party must demonstrate that the actual or anticipated communications are or will be "abusive in that '[they] threaten[] the proper functioning of the litigation.'"  *Jeld-Wen*, 250 F.R.D. at 561 (quoting *Cox Nuclear Med. v. Gold Cup Coffee Servs., Inc.*, 214 F.R.D. 696, 698 (S.D. Ala. 2003)); *see also Williams*, 658 F.2d at 435 ("[T]here must be a specific showing by the moving party on the record of abuses or potential abuses.").  Examples of abusive communications are those that are false or misleading, contain material omissions, or are coercive or intimidating.  *See Jeld-Wen*, 250 F.R.D. at 561; *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 252 (S.D.N.Y. 2005); *Cox Nuclear Med. v. Gold Cup Coffee Servs.*, Inc., 214 F.R.D. 696, 698 (S.D. Ala. 2003); Manual for Complex Litigation (Fourth) § 21.12 (explaining that a party may not "give false, misleading, or intimidating information, conceal material information, or attempt to influence the decision about whether to request exclusion from a class").

Even if there is clear evidence that a party has engaged or will engage in abusive communications with the potential class members, a court may only impose "the narrowest

possible relief which would protect the respective parties." *Gulf Oil*, 452 U.S. at 102

(quoting *Coles v. Marsh*, 560 F.2d 186, 189 (3d Cir. 1977)) (internal quotation marks

omitted); *see also Williams*, 658 F.2d at 435 (explaining that the court must impose "the

least restrictive means available to protect" the class members' rights).  Overly broad relief

can violate the First Amendment.  *See Kleiner*, 751 F.2d at 1205-06.

### B.   Whether to Enjoin Communications Under Rule 23(d)

In the instant case, Plaintiff has failed to establish a clear record of abusive

communications on the part of GM.  Therefore, it would be inappropriate under Rule 23(d),

and would potentially violate the First Amendment, for the Court to enjoin GM from

communicating with the potential class members.

First of all, there is nothing coercive or intimidating about the communications.

Courts have found communications to be coercive (or to at least have the potential for

coercion) where there is an ongoing business relationship between the potential class

members.  *See Sorrentino v. ASN Roosevelt Ctr. LLC*, 584 F. Supp. 2d 529, 533 (E.D.N.Y.

2008).  And the Class Vehicle lessees (and arguably the Class Vehicle owners) have

ongoing business relationships with GM.  But a review of cases involving coercion shows

that there is nothing coercive about the communications and business relationships in the

instant case.  *See Wright v. Adventures Rolling Cross Country, Inc.*, No. C-12-0982 EMC,

2012 WL 2239797 (N.D. Cal. June 15, 2012) (unpublished); *Ralph Oldsmobile, Inc. v. Gen.*

*Motors Corp.*, No. 99 CIV. 4567 (AGS), 2001 WL 1035132 (S.D.N.Y. Sep. 7, 2001)

(unpublished).

In *Ralph Oldsmobile*, an Oldsmobile dealership sued GM (which at that time

manufactured the Oldsmobile line of cars) on behalf of a putative class of Oldsmobile

dealerships. 2001 WL 1035132, at *1. The plaintiff sought to recover reimbursements for warranty services that the dealerships had provided to Oldsmobile purchasers. *Id.* Around that time, however, GM announced that it was canceling the Oldsmobile line and mailed letters to the Oldsmobile dealerships stating that GM would be offering transition payments to help the dealerships transition to another GM brand. *Id.* To accept the transition payments, the Oldsmobile dealerships had to waive their claims for unpaid warranty services. *Id.* The district court held that the dealerships' reliance on GM for transition payments resulted in the potential for coercion. *Id.* at *4-*5. The court also held that it was possible that the dealerships would make an unknowing waiver, since the letter did expressly mention the class action. *Id.* The court did not go so far as to prohibit further communications by GM to the dealerships but *did* require GM to send a notice to the dealerships, at its expense, informing them of the class action. *Id.* at *7.

In *Wright*, two plaintiffs sued their former employer on behalf of a class of current and former employees. 2012 WL 2239797, at *1. The defendant employer sent communications to the named plaintiffs and the unnamed putative class members stating that the named plaintiffs were unethical and solely interested in money and suggesting that any employees who involved themselves in the lawsuit would "expose themselves to the searing scrutiny and time commitment of a public trial for a few hundred dollars." *Id.* at *5. The court held that these communications were abusive because they "could have [had] a chilling effect on participation in the class action." *Id.*

The instant case is clearly distinguishable from both *Ralph Oldsmobile* and *Wright*. Both of those cases involved threats that were at least implicit. But in the instant case, GM has not threatened the potential class members, explicitly or implicitly. Rather, the letter

-24-

and the website present each customer with the option of either accepting the "reimbursement" offer (and thus waiving the right to sue) or declining the offer (and thus preserving the right to sue).  Moreover, in *Ralph Oldsmobile* the communications sent by the defendant to the potential class members suggested that the potential class members would be deprived of some important benefit, unrelated to the subject matter of the class action, if they were to participate in the class action.  In the instant case, however, there is no indication that the class members will be deprived of anything, except GM's offered reimbursement, if they choose to participate in the class action.  The only thing potentially coercive about the communications in the instant case is that the website states that the customers must claim their reimbursement by August 1, 2016.  But this deadline seems reasonable.  GM sent the letters to the potential class members in late May, and thus the potential class members have been given over two months to decide whether to accept GM's offer of reimbursement.  In sum, there is no coercion.

The letter and website are also not sufficiently misleading to constitute abusive communications.  Admittedly, their use of terms like "reimbursement" and "compensation" can be argued as misleading and perhaps implies to some potential class members that the reimbursement offer is the result of a settlement or verdict in a lawsuit.  Also, the second web page (Doc. 13-2 at 18) juxtaposes language notifying the customer of the existence of the class action lawsuits with language stating that "if you wish to proceed to claim your compensation, click NEXT."  This perhaps misleadingly implies that the "compensation" is the result of a settlement or verdict.  Furthermore, the letter and the website's references to "two offers" (the debit card and the extended warranty) and the letter and the website's use of language like "[w]hichever option you choose" may

misleadingly imply to some extent that the only choice to be made is the choice between the two offers.  And finally, the release itself is perhaps somewhat misleading in that it does not use the term "class action" or expressly mention the instant lawsuit.

However, even if these aspects of the letter and the website are misleading when taken out of context, the communications as a whole are not misleading.  On the website, GM repeatedly explains that a customer who accepts the reimbursement offer waives his or her right to *any* claim or action.  The website mentions the three class action lawsuits, and it even links to the complaints.  GM's website explains that it is purely *GM's* view that the reimbursement offer is fair, not the Court's or the class-action attorneys'. (*See* Decl. Julie Heisel Ex. C-2).  The website also repeatedly suggests that the customer may wish to consult an attorney.  Therefore, the communications as a whole are not misleading.

Plaintiff complains that GM's letter and website do not summarize the class action. But GM linked to copies of the complaints and advised the potential members to contact the class actions' counsel, and therefore it was not necessary for GM to provide summaries of the lawsuits.  Plaintiff also complains that the communications do not explain to potential class members that they may be entitled to punitive damages or damages for the diminution of value of their vehicles.  But the complaint for the instant case explains that Plaintiff is seeking damages for diminution of value and punitive damages.  (*See* Compl. ¶ 44 & prayer for relief)).  Plaintiff also complains that the communications fail to explain how GM calculated the offer of $750 or $1,500.  Contrary to Plaintiff's assertion, however, GM provided a clear explanation of how it calculated the reimbursement offer on its Frequently Asked Questions page.  Finally, Plaintiff complains that the letter and website fail to explain that the potential class members might be able to obtain higher damages if

-26-

they proceed with the class action.  But as GM's counsel noted during the hearing, GM's letter and website are completely up front about the fact that the compensation is only compensation for increased fuel costs resulting from the lower fuel economies of the vehicles; thus, an ordinary person who takes the time to read the Frequently Asked Questions and the complaint linked on GM's website could easily conclude that the class action presents the opportunity to recover a higher amount of damages.[17]

While the affidavits offered by Plaintiff show that some individuals were confused by GM's communications, these individuals represent only a tiny fraction of the tens of thousands of possible class members.  Moreover, the fact that these individuals reached out to Plaintiff's counsel suggests that GM's communications are not misleading as a whole: To the extent that some individuals were confused, they sought out legal advice, as GM's website recommends.

The nonbinding cases cited by Plaintiff are not analogous to the present case.  For example, in *County of Santa Clara v. Astra USA, Inc.*, No. C 05-03740 WHA, 2010 WL 2724512 (N.D. Cal.. July 8, 2010) (unpublished), the court held that a settlement letter was

---

[17] A related argument, repeated multiple times by Plaintiff's counsel during the motion hearing, is that GM is effectively offering the "worst case scenario" to the putative class members.  But Plaintiff's argument ignores the possibility that GM may have defenses to Plaintiff's claims and that the class members may therefore recover less from the class action than they would from accepting GM's reimbursement offer.  Plaintiff's argument also ignores the time value of money—some potential class members may prefer receiving a lower reimbursement now over waiting years for an uncertain class-action recovery.  Thus, GM's reimbursement and the associated release do not appear substantively unfair.  Ultimately, of course, the question that the Court must decide is whether the communications in question are misleading, coercive, or otherwise abusive.  But the fact that the reimbursement offer itself is not obviously unfair provides further confirmation for the Court's conclusion that GM has not done anything improper that would justify the Court's intervention at this time.

misleading.  The defendant had mailed the letters to potential class members and enclosed a check.  The letters stated that "this check is tendered in, and your acceptance will constitute, full and final satisfaction of any actual or potential claim by you."  *Id.* at *2 (emphasis removed).  Moreover, the letter included a paragraph stating that a class action lawsuit had been filed and identifying that lawsuit by caption and docket number.  *Id.*  The letter explained that the defendant "will maintain that any [person] that has cashed a check provided hereunder has fully and finally compromised any claim" under the class action.  *Id.*  A copy of the complaint was not enclosed with the letter, and the letter did not provide contact information for the class action counsel.  *Id.* at *3.  The court held that the letter was misleading and, "at a minimum should have explained the specific claims that plaintiffs allege . . . , precisely how the [settlement amount was] calculated, and how closely the new calculations aligned with plaintiffs' allegations."  *Id.*  The court therefore invalidated the releases that had been obtained thus far.  *Id.* at *6.; *see also Cheverz v. Plains All American Pipeline, LP*, No. CV 15-4113, 2016 WL 861107, *4 (C.D. Cal. Mar. 3, 2016) (unpublished) ("Although the [release] notifies victims that a consolidated class action exists, it does not provide additional information, such as an explanation of the Plaintiffs' claims or the contact information for Plaintiffs' counsel.  Courts routinely hold that releases are misleading where they do not permit a putative class member to fully evaluate his likelihood of recovering through the class action.").

Both *Santa Clara* and *Cheverz* are distinguishable from the instant case because in those cases, the defendant did not provide the potential class members with a copy of (or a link to) the complaint or contact information for the class-action counsel.  *See also Reid v. Unilever U.S., Inc.*, 964 F. Supp. 2d 893, 926-29 (N.D. Ill. 2013); *Eshelman v.*

*OrthoClear Holdings, Inc.*, No. C 07-01429 JSW, 2007 WL 2572349, at *3 (N.D. Cal. Sep. 4, 2007) (unpublished)( ("If [the defendant] had not apprised [the plaintiff class members] that this lawsuit was pending, or if it had omitted the [complaint] with its mailing, the Court would be more inclined to agree . . . that court intervention was necessary.").[18] Moreover, in both *Santa Clara* and *Cheverz*, the defendant did not inform the potential class members that they may wish to seek the advice of counsel before accepting the release. Here, GM has done so, and in fact multiple potential class members have contacted class counsel.

Similarly, in *O'Connor v. Uber Techs., Inc.*, No. C-13-3826 EMC, 2013 WL 6407583 (N.D. Cal. Dec. 6, 2013), the defendant sent an electronic notification to its drivers, the putative class members, asking them to approve a new "Software Licensing and Online Services Agreement." Buried in that agreement was a section titled "How Arbitration Proceedings Are Conducted." *Id.* at *6. That provision waived the drivers' right to participate in a class action or any other lawsuit. *Id.* The drivers could accept the agreement by "swiping a button on their mobile phones." *Id.* at *1. The court noted that "many, if not the majority of, Uber drivers are . . . immigrants for whom English is not their native language." *Id.* at *6. The court therefore held that the arbitration agreement was

---

[18] There was some discussion about the *Eshelman* case at the motion hearing. Plaintiff contends that *Eshelman* is distinguishable because GM's letter and website are not as clear as the settlement letter in *Eshelman*, which the court found to be acceptable. Unlike the communications in the instant case, the settlement letter in *Eshelman* included text in bold, uppercase characters specifically stating that a class member's acceptance of the settlement would result in waiver of any rights in the pending class-action lawsuit. (*See* Settlement Letter from *Eschelman* case, Doc. 18-1). The Court acknowledges that it might have been better for GM to have been as clear as the defendant in *Eshelman*. But, as GM's counsel explained at the hearing, the relevant standard under *Gulf Oil* and the related lower-court cases is not *perfection*. Rather, the question is whether there is a clear record of abuse. There is no such record in the instant case.

abusive and ordered corrective notices under Rule 23(d).   *Id.* at \*6-\*7.   *Uber* is distinguishable from the instant case.   Unlike the potential class members in *Uber,* who were presented with a misleadingly named waiver buried in a larger contract, the potential class members in the instant case were given a clear, freestanding release agreement. Moreover, unlike the potential class members in *Uber*, who could accept the waiver by merely swiping the screens of their smart phones, the potential class members in the instant case were required to go through a number of affirmative steps in order to accept the release.

In *Southeastern Milk*, 2009 WL 3747130, another case relied on by Plaintiff, the putative class members were presented with a settlement offer and were given the opportunity to contact class counsel.   The court held that these offers presented a potential for abuse because the class counsel were subject to a protective order that prevented them from sharing key information about the case to the potential class members.   *Id.* at \*3.   As the court explained, "[a]s long as the protective order continues to shield a vast volume of relevant documents from review by the members of the putative class and/or their counsel, settlement offers can only be fairly evaluated and pursued through the established mediation process already in place."   *Id.*   *Southeastern Milk* is also clearly distinguishable from the instant case.   In the instant case, there is no protective order in place preventing counsel from discussing what they know with the potential class members.   The potential class members' knowledge, and the knowledge of class counsel, are admittedly limited due to the early stage of the case.   But if the potential class members seek legal counsel, as GM advises them to do, they can fairly decide for themselves whether to accept a settlement now with limited information or to proceed with the case.

In sum, there is nothing misleading about the communications. Because the communications were neither coercive nor misleading, it would not be appropriate for the Court to exercise its authority under Rule 23(d). Therefore, the Court will not at this time enjoin GM from communicating with the potential class members.

### C.   Whether to Invalidate Releases Obtained Thus Far

Courts that have confronted the question whether to invalidate releases already obtained from potential class members have generally held that it is inappropriate to unilaterally invalidate such releases. *See, e.g.*, *Friedman*, 730 F. Supp. 2d at 767-78; *Ralph Oldsmobile*, 2001 WL 1035132, at *7. There are two compelling reasons. First, it is not obvious that Rule 23(d) authorizes a court to unilaterally void executed releases. *See Ralph Oldsmobile*, 2001 WL 1035132, at *7; *but see Santa Clara*, 2010 WL 2724512, at *6 (invalidating releases).[19] Second, it is inappropriate for a court to void releases without first knowing whether those who executed the releases *want* the releases to be voided. *See Ralph Oldsmobile*, 2001 WL 1035132, at *7; *see also Friedman*, 730 F. Supp. 2d at 767 ("[T]he putative class members here have not individually requested that [the court] void their releases, and doing so *en masse* would not be appropriate given the individualized nature of the inquiry."). Rather, courts have held that the appropriate solution is to wait until after the class is certified and then include a statement in the class-action notice stating that the court will entertain applications to void any releases previously signed. *See Friedman*, 730 F. Supp. 2d at 767.

---

[19] It would appear that the answer to the question whether a release should be invalidated should depend on contract-law principles, which neither Plaintiff nor GM has briefed.

-31-

As discussed above, GM's communications were not abusive and therefore the Court will not enjoin further communications by GM to the potential class members.  For the same reason, the Court will not invalidate the releases obtained thus far.  To the extent that there are grounds (perhaps under contract law) to invalidate the releases, the Court will address the relevant arguments if and when Plaintiff files a second motion for class certification or at some later time, as appropriate.  But the Court will not unilaterally void the releases without first knowing whether the 65,000+ individuals who executed them want the releases to be voided.

## IV.    Conclusion

Plaintiff's motion for provisional class certification and appointment of class counsel (Doc. 6) is DENIED IN PART and GRANTED IN PART.  The Court GRANTS Plaintiff's request to appoint interim class counsel.  The Court hereby DESIGNATES Plaintiff's current counsel of record as INTERIM CLASS COUNSEL.  All other requests in Plaintiff's motion for provisional class certification and appointment of class counsel (Doc. 6) are DENIED.  Plaintiff's motion to invalidate releases and enjoin communications from GM (Doc. 7) is DENIED.

**IT IS SO ORDERED**.

Dated:  June 30, 2016

s/George Caram Steeh_____
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
June 30, 2016, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk